270 P.2d 720

**NELSON et al.**

v.

**EIDAL TRAILER CO. et al.**

No. 5618.

Supreme Court of New Mexico.

May 18, 1954.

Hannett & Hannett, W. S. Lindamood, Albuquerque, for appellants.

Simms, Modrall, Seymour, Simms & Sperling, George T. Harris, Jr., Albuquerque, for appellees.

SADLER, Justice.

The plaintiffs, James H. Nelson and Emma Nelson, who are appellants in this Court, seek the review of a judgment of the district court of Bernalillo County denying them workmen's compensation for the death of their son, Tommy Nelson, said to have resulted from injuries suffered by him while in the employ of the defendant, Eidal Trailer Company, hereinafter referred to as the Trailer Company. Its insurer, Mountain States Mutual Casualty Company, is joined as a defendant. They claim exemption from liability, contending that decedent, at the time of his death, was in the employ of Albert H. Kaiser, an independent contractor, thus denying compensation for his death as an employee of the defendant. Having found the facts favorably to the claim of defendants, the trial court rendered judgment against plaintiffs and dismissed their complaint. The present appeal is prosecuted from that judgment.

At the time of decedent's death the defendant, the Trailer Company, a New Mexico corporation, having its principal place of business in Albuquerque, New Mexico, was engaged in the manufacture of trailers of a type which permitted their loading on a large semi-trailer to be delivered to the ultimate consumer by means of the semi-trailer and a tractor truck. A contract existed between the Trailer Company and Albert H. Kaiser under which the latter was to receive a flat fee for the loading of small pole trailers upon a large flat bed trailer, on which the small trailers were to be transported and delivered by the Trailer Company to their destination. In the performance of his contract Kaiser hired and himself paid such men as he considered necessary for performance of the work of loading the trailers. Neither the Trailer Company, nor its agents or employees, directed or were authorized to direct the method of loading the trailers. On June 29, 1951, at or near the Trailer Company's place of business in Albuquerque, Tommy Nelson, son of the plaintiffs, sustained personal injuries which resulted in his death on July 9, 1951.

In the course of Kaiser's performance of his contract with the Trailer Company, he engaged the services of a helper by employing one Clarence Moore. Shortly prior to June 29, 1951, Kaiser requested Moore to load such trailers as it might become necessary to load during a period of time he planned to be absent from Albuquerque. Pursuant to this request on Moore so made by Kaiser, the former on June 29, 1951, undertook to load some

trailers. Still moving in compliance with the request made upon him by Kaiser, which also embraced instructions to assemble and direct a crew of from two to three men in loading the trailers, Moore requested Tommy Nelson to assist when necessary in the loading of the trailers. It was pursuant to this request on Moore by Kaiser that Tommy Nelson accompanied Moore to the premises of the Trailer Company on June 29, 1951.

In doing the work he did, Moore was an employee of Albert Kaiser. Tommy Nelson, if he was ever employed by anyone, was likewise an employee of Kaiser, but neither Moore nor Kaiser, or Nelson were employees of Eidal Trailer Company or Eidal Manufacturing Company. Furthermore, the said Albert Kaiser not only was not an employee of Eidal Trailer Company, but rather was an independent contractor engaged in the performance of an independent contract under his agreement with Eidal Trailer Company. And by the same token none of Kaiser's employees, including Tommy Nelson, son of the plaintiffs, on account of whose death this claim for compensation is prosecuted, were employees of Eidal Trailer Company.

The court, having found the foregoing facts, concluded as a matter of law that the agreement under which Kaiser loaded trailers manufactured by Eidal Trailer Company was not a contract of employment between the two; that rather it gave Kaiser the status of an independent contractor in his relationship to Eidal Trailer Company, thus denying him character as an agent, servant, or employee of the Trailer Company. The court further concluded that by the same token and for the same reason, Tommy Nelson was not an employee of Eidal Trailer Company within the purview of the Workmen's Compensation Act of the State of New Mexico. 1941 Comp. § 57-901 et seq. Hence, as the court went on to conclude, at the time of his injuries, neither he while living nor his survivors were entitled to any benefits under the Workmen's Compensation Act of the State of New Mexico. The findings and conclusions left the court but one alternative which was to dismiss the complaint seeking compensation. It is from that order that this appeal is prosecuted.

It is apparent from the findings made that the proper conclusions of law were deduced, putting us right back to a determination of sufficiency of the evidence to support the findings. Counsel for the plaintiffs present a vigorous challenge on this very point, strongly urging that we should hold as a matter of law on the evidence adduced that Kaiser was an employee and, for the same reason, that the decedent was an employee. Much of the evidence is set out in the plaintiff's brief and if it could be accepted at its face value

there would be no question of our right and duty to pronounce the contract under which Kaiser operated one of employment. There is not room to doubt, had the court accepted it as a basis for findings to that effect, it would have afforded ample support for them.

The trouble with declaring such a result here, however, is that there is other evidence by defendants which directly conflicts with that relied upon by plaintiffs and it is this testimony which the trial court saw fit to accept on the factual issue presented. Having so ruled, there is only one inquiry to which we need seek an answer, namely, whether the evidence presented by defendants supports the findings made. There can be but a single answer to that inquiry and it is that it does. Indeed, the evidence as a whole presents the situation often confronting us, viz., where the evidence is such that it would have supported findings either way on the decisive factual issue.

In the main the conflicting testimony, on the resolving of which in favor of defendants, the trial court based its findings, came from Albert H. Kaiser, with whom defendants contracted for the loading of the trailers on semi-trailers, witness for the plaintiffs, and one Clyde Mineau, former manager for the Trailer Company, testifying in its behalf. A fair sample of Kaiser's testimony on the subject follows:

"Q. Now, when you started this loading, did—was there anybody there, the first time you went out there, to tell you—show you how to load them, or anything like that? A. Yes, Mr. Mineau, and the Government men was there at the time of the first loading, to okeh the procedures of the way the load was loaded.

"Q. And were they there the second time? A. Not all the time. They would come and, various times, and then leave again.

"Q. Did they check on how you were loading it, during that time? A. That is right.

"Q. Did they ever ask you to make any changes in the method you were loading it? A. Quite a few of the times.

"Q. Did you have to load to meet their satisfaction? A. That is right.

\*    \*    \*    \*    \*    \*

"The Court: \* \* \* You say they showed you how, the first time? A. Well, that is the general idea of it, yes.

"The Court: And then, the second time, at least, they were there? A. That is right.

"The Court: Did they make some changes in your method of loading,

the second time? A. Well, roughly, I would say yes.

"The Court: Did they ever, after that? A. A number of times after that. We have changed it.

"Q. Did they keep a check on you, every time that you loaded? A. Well, I would say that they did, because there was somebody there, the majority of the time, either starting, or the finishing of the load.

"Q. And did they, right through, up until the time in June, when Mr. Moore was to take over for you, did they keep a check on how you were loading? A. Well, yes.

\* \* \* \* \* \*

"Q. Did—while you were out there, did you work under their supervision? A. Well, I suppose so. If things wasn't going like they wanted them to, they told me about it. \* \*."

Continuing on cross-examination, Kaiser testified:

"Q. Now, on this first occasion, had you had any prior experience in loading loads of that type? A. Not of that particular type, no.

"Q. And the instruction that you received, at that time, was more or less a check out, wasn't it, on the arrangement of the trailers on the flatbed, and the securing of them, so that they would pass Government inspection? A. That is right.

"Q. On the occasion of these inspections that were—took place during the course of this loading, or after the loading, that was to the ultimate satisfaction of the Government inspector, was it not? A. Well, first, Mr. Mineau was checking on me, too, you know—to make sure that the trailers was in place, secured right, and then the Government inspector would inspect them, later.

"Q. Umhumm. Now, who had the final say on whether or not the trailers were loaded properly—The Government man? A. Well, to me, it was Mr. Mineau.

"Q. Did the Government man ever make any suggestions or directions as to how the trailer should be loaded or secured? A. Indirectly, yes.

"Q. You mean, he would tell Mr. Mineau, and Mr. Mineau would pass the information on to you? A. Yes.

"Q. So that made the Government inspector the man who said whether or not that trailer was fit to go out, or whether it wasn't? A. That is right."

And as a fair sample of Mineau's testimony, we quote the following, to-wit:

"Q. Now, was there anything said or understood, about how many men he would have to do this loading, at all? A. No.

"Q. Was there anything said between you and him, as to who would employ the men to assist him in this? A. No.

"Q. Was there anything—was there any contract in writing at all, between you and Mr. Kaiser? A. No. It was a verbal contract. Verbal agreement.

\* \* \* \* \* \*

"Q. When they would come to the yard of the Eidal Trailer Company, to load these trailers, was there any specified time of day or night, that they were to do their work? A. No.

"Q. Did you, or any of your subordinates, attempt to supervise the manner in which the loading was done? A. No.

"Q. At any time, did you give any instructions to Mr. Kaiser, other than to tell him about what the load was, and as to how it should be distributed, before he started? A. On one occasion we had—we had had some trouble with overloading on the highway, and it was necessary to get together with him, and discuss the position on which the trailers were loaded on the hauling vehicle, to keep from being penalized by the Highway Department, when they crossed through various states, going into Memphis.

"Q. Was the loading procedure changed in accordance with your loading instructions, at that time, thereafter? A. Yes.

"Q. And that was to meet highway requirements? A. That is right.

"Q. Did you ever stay with Kaiser or his crew, while they were loading and attempt to tell them where to place the particular units being loaded, or anything of that sort? A. No. No.

\* \* \* \* \* \*

"Q. Was there an understanding as to how long this loading of trailers was going to continue? A. Not definitely, no.

"Q. You could have terminated, at any time you wanted to? A. The original conversation was that if the work was satisfactory, he would work for the entire contract.

"Q. And if it wasn't, you could terminate it, any time? A. It could be terminated."

Continuing on cross-examination, Mineau testified:

"Q. You had a right to direct him, as to how he was putting those trail-

ers on, didn't you, loading them? And if you directed him, he had to obey your orders? A. How do you mean 'a right'?

"Q. You could have told him what to do, couldn't you, out there, under the loading of the trailers? A. Yes, I could have.

"Q. And if you had told him, he would have obeyed your orders? A. By the same token, I could have told any other sub-contractors that were working for us, if the work was not right, to the specifications that were required, couldn't I?

"Q. Did—now, the first time that they loaded, out there, did you supervise that, all the way through? A. No.

"Q. Didn't have anything to do with that, the first time he loaded? A. No, I told him there were fourteen trailers on the ground, I wanted them put on the trailer."

On redirect examination the witness Mineau testified:

"Q. When you said, in answer to Mr. Hannett's question, that you had the right to control the work, did you mean that you had the right to supervise it in any manner, or did you mean that you had the right to see that the ultimate load was loaded, and in a roadworthy condition? A. Due to our obligation with the Government, at Memphis, and the ultimate consumer, it was necessary to see that the loads were satisfactorily secured, and ready for shipment.

"Q. Was that your only concern with the way the work was done? A. That is right.

"Q. And as to the time and method of doing that work, did you have any right to control or supervise that? A. No."

On recross-examination the witness Mineau testified as follows:

"Q. You inspected the load before it went out? A. Yes.

"Q. With this Government contract? A. I say, I inspected it. Either myself or Mr. Hampton inspected it. If I wasn't there, Mr. Hampton inspected the load.

"Q. And anything you found wrong, you could have Mr. Kaiser change? A. I could.

"Q. And the Government inspector would inspect the load? A. At the time Mr. Kaiser was loading, the Government inspectors were not inspecting the load. Subsequent to that time, we were forced by the Government inspectors, to have them called to inspect each load, due to the losses

they were getting at the other end, which we had to furnish equipment for, to replace, to give them the completed unit. It was through that condition that we terminated Mr. Kaiser's services.

\*    \*    \*    \*    \*    \*

"Q. Then, as I understand your testimony, either you or Mr. Hampton would inspect the load to see whether or not it was securely fastened and tripworthy? A. That is right."

It was on the conflict reflected by the portions of the testimony quoted from the two witnesses mentioned that the trial court based its findings. One cannot doubt the sufficiency of the evidence to support the decisive finding made that the witness, Kaiser, was an independent contractor, rather than an employee of the Trailer Company. It follows as the night the day that, as the trial court stated in its findings, if Tommy Nelson was an employee of anyone, he was an employee of Kaiser whose employee, Moore, engaged his services, and was responsible for his pay. We can arrive at no other conclusion under the evidence.

Applying the controlling law, then, to the findings made, we must still determine whether the terms of the arrangement between the Trailer Company and Kaiser make him an employee, or an independent contractor instead, as the trial court ruled

in the conclusions of law announced. A leading case on the subject in our past decisions is that of Burruss v. B. M. C. Logging Co., 38 N.M. 254, 31 P.2d 263, upon which counsel for the plaintiffs place chief reliance. This is explainable, no doubt, for the reason that the workman, who was accidentally killed, was held to be an "employee" within the protection of the Workmen's Compensation Act, rather than an "independent contractor," and a judgment in favor of his widow was affirmed. A contrary result in Bland v. Greenfield Gin Co., 48 N.M. 166, 146 P.2d 878, may likewise explain the effort of plaintiff's counsel to distinguish that case after citing it.

A reading and study of the two cases satisfies us that the facts of the present case conform more nearly to those dealt with in the Bland case than they do with those made decisive in the Burruss case. In the latter case, to point out some of the factual differences between that case and this one, the workman was under the direction of a boss or superintendent, the defendant retained the superintendency of the operations and the logs were loaded onto the truck of the deceased by the servants and employees of the defendant. We called attention in that opinion to the fact that there is no single or sure criterion affording a test of when the relationship is that of employee and when that of an independent contractor. "A fact found

controlling in one combination may have a minor importance in another", states Mr. Justice Watson writing for the court. [38 N.M. 254, 31 P.2d 264.] We went on to say:

"The employee renders personal service. The independent contractor may or may not. In both cases, the employer exercises authority. Beyond doubt the character of such authority or control is the usual and generally accepted test. The result to be achieved by the independent contractor is controlled by the employer. But, when the control descends to the details or to the means and methods of performance, we have a servant or employee. This general test we find variously stated."

We think the case of Bland v. Greenfield Gin Co., supra, discloses facts more nearly parallel to those here involved than does the Burruss case. We there overturned as not supported by substantial evidence, the basic finding that under the agreement between the deceased and defendant the latter retained full control of his performance under the contract. We held the relationship shown was that of an independent contractor and reversed and remanded a judgment in claimant's favor and directed a dismissal of the complaint. The gist of our holding is summarized in paragraph three of the syllabus, where it is said:

"Where contract by which trucker was engaged by gin company to haul seed to designated places left details of work, hiring of extra help and amount of wages paid entirely to trucker, who performed work free of supervision or control of gin company, trucker was an 'independent contractor', and finding that trucker was an 'employee' within coverage of compensation act was not supported by substantial evidence, and award for death of trucker based on such finding was erroneous."

Our opinion in the Bland case quotes approvingly from the Illinois case of Ferguson & Lange Foundry Co. v. Industrial Commission, 346 Ill. 632, 179 N.E. 86, 87, where the facts conform themselves strongly to those here present. The Illinois Supreme Court in that case said:

"It is impossible to lay down a rule by which the status of a person performing a service for another can be definitely fixed as an employee or as an independent contractor. Ordinarily no single feature of the relation is determinative, but all must be considered together. * * * he employed assistants whenever necessary; he was free to do hauling for others and when ill he substituted another

person in his stead. In his arrangement with the foundary company no hours were fixed for the rendition of his services; he began and quit work when he desired; he delivered the waste material to places of his own selection, and when he sold a load of cinders he was neither obliged to report the sale nor to account to the plaintiff in error for it. The foundry company did not concern itself with the details of the work in which the defendant in error was engaged; the time and manner of performance were left to the latter's discretion, and his responsibility to the plaintiff in error was for the result which it sought to obtain."

We can almost paraphrase the facts of the case at bar for those recited in the opinion just quoted from, as so aptly summarized by counsel for defendants in their answer brief, to-wit:

"For example, Albert H. Kaiser employed his own help, making his own arrangements with his own employees as to the compensation they were to receive for their work; he was free to do loading and hauling for others. At least two-thirds of his income was derived from his regular trucking business operations, with the subject loading job contributing only one-third of his income; he had conducted his own trucking business under the name of 'Independent Trucking Service' for about four years prior to the accident in question. When he left town he was free to substitute others in his stead without consulting Appellees; in his arrangement with Appellees, no hours were fixed for the rendition of his services; he began and quit work when he desired; the time and manner of performance were left to his discretion, and his responsibility to the Appellees was for the result which it sought to obtain. He was paid a contract price of $75.00 for each load, pursuant to statements rendered by him under the name of 'Independent Trucking Service', * * *."

See, also, De Palma v. Weinman, 15 N.M. 68, 103 P. 782, 24 L.R.A.,N.S., 423; Sucetti v. Jones' Estate, 38 N.M. 327, 32 P.2d 815; Massey v. Poteau Trucking Co., 221 Ark. 589, 254 S.W.2d 959; Annotation in 75 A.L.R. 725, under subject "Tests in determining whether one is an independent contractor"; Annotation in 120 A.L.R. 1031 under subject, "Teamsters or truckman as independent contractor or employee under workmen's compensation acts."

The trial court did not err in holding that Kaiser was an independent contractor thus making of the decedent an employee of his and not of Eidal Trailer Company.

The findings on which such conclusion was reached are based on substantial evidence and they in turn support the judgment rendered. It follows that it should be affirmed and

It is so ordered.

McGHEE, C. J., and COMPTON and LUJAN, JJ., concur.

SEYMOUR, J., not participating.